**PIONEER INSURANCE COMPANY, a corporation, Appellee,**

v.

**Harry GELT, Appellant (two cases).**

**Nos. 76–1392 and 77–1262.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1977.

Decided July 5, 1977.

Rehearing Denied Aug. 3, 1977.

---

2. Hancock may of course raise this claim on a motion to vacate his sentence under 28 U.S.C. § 2255.

John P. Morris, Tempe, Ariz. (argued), and Herbert J. Friedman, Lincoln, Neb., on brief, for appellant.

Norman Krivosha (argued), and Bernard Wishnow, Lincoln, Neb., on brief, for appellee.

Before LAY, WEBSTER and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Appellee, Pioneer Insurance Company (Pioneer), a Nebraska corporation, brought this action against Harry Gelt, a citizen of

Arizona, to recover judgment on a note in the principal sum of $97,200.00 executed by Gelt in favor of Pioneer on or about September 21, 1972. The note was in renewal of an earlier note in the sum of $90,000.00 which had been executed by Gelt in favor of Educators Security Insurance Company (Educators), which was later merged into Pioneer. The second note included accrued interest on the first note.

The suit was filed in the District Court of Lancaster County, Nebraska, and service was had in Arizona under the provisions of the Nebraska long-arm statute. Neb.Rev. Stat. §§ 25–535 *et seq.* The defendant removed the case on the ground of diversity of citizenship, and moved to dismiss the complaint for lack of in personam jurisdiction. That motion was denied without opinion by a visiting judge.

Gelt then answered and denied liability. He also filed a counterclaim against Pioneer and in connection therewith pleaded as a set-off the amount of money that Pioneer was undertaking to recover from him. In addition Gelt filed a third party complaint against Roger D. Sack alleging that if defendant should be held liable to Pioneer, he was entitled to judgment over against Sack on the basis of an alleged agreement on the part of Sack to hold him harmless with respect to the note in suit.

In April, 1976 the case was tried on the merits before Chief United States District Judge Warren K. Urbom without a jury. On April 14, 1976 Judge Urbom filed detailed findings of fact and conclusions of law and entered judgment. The judgment awarded Pioneer $132,037.01, which was the principal amount of the note sued upon, plus accrued interest; it dismissed defendant's counterclaim; and it awarded the defendant judgment over against Sack. A motion for a new trial as provided by Fed. R.Civ.P. 59 was filed, considered and overruled, and a notice of appeal was timely filed. That appeal has been docketed as No. 76–1392.

In late 1976 Gelt filed a motion for relief from judgment under Fed.R.Civ.P. 60(b)(2)(3) and (6), alleging that he had newly discovered evidence which warranted vacation of the judgment and that the judgment had been obtained by fraud. The district court permitted the original record to be supplemented, and on February 27, 1977 filed a memorandum opinion and entered an order denying the motion. Defendant appealed from that order, and the appeal was docketed as No. 77–1262. The two appeals were consolidated and argued together.

In No. 76–1392 the defendant argues, first, that the district court erred in refusing to dismiss the complaint for lack of personal jurisdiction. Alternatively, the defendant contends that even if jurisdiction of his person was present, the district court erred in awarding judgment against him on the merits, and in dismissing his counterclaim. In No. 77–1262 the defendant argues that the district court abused its discretion in denying his Rule 60(b) motion.

The basic facts of the case may be summarized as follows:

The case involves a number of persons and corporations including three Nebraska life insurance companies. In addition to Pioneer, which has been mentioned, those companies were Superior Benefit Life Insurance Company (Superior Benefit) and Educators Security Insurance Company (Educators). Controlling stock in all of those companies was owned by a holding company, Superior Equity Corporation (Superior Equity), which is a Delaware corporation with its principal place of business in Lincoln, Nebraska. Roger D. Sack, who resided in Nebraska until 1974, owned a majority of the stock in Security Equity and was President of that company and of all three of the insurance companies. He was also a member of the Board of Directors of each of the four corporations. Sack and the defendant, Gelt, were close personal friends.

In late 1970 Sack became interested in acquiring a controlling interest in an Iowa corporation known as Iowa Business Investment Company (IBIC) and merging it into Superior Equity. The reason for Sack's interest was that IBIC had liquid assets

which would be beneficial to the Sack insurance company combine.

The majority of the stock in IBIC was owned by Richard C. Gaffney, a citizen of Iowa. Gaffney's stock ownership amounted to 100,000 shares. In late 1970 or early 1971 Sack discussed with Gaffney a merger of the two corporations. Gaffney was not interested in a merger, but he was interested in selling his stock, and Sack was willing to buy it for $3.00 per share.

Sack's contemplated merger of Superior Equity and IBIC would require the approval of the Securities & Exchange Commission, and since both Sack and Gaffney considered themselves to be "insiders" within the meaning of federal securities regulations, they felt that the sale of the IBIC stock by Gaffney to Sack would have to be concealed by the use of "front men."

It was decided that Donald F. Zimmer would appear as the ostensible seller of the stock, and Sack induced his friend Gelt to become the ostensible buyer. Gelt was assured by Sack that the former would not be exposed to any risk of financial loss as a result of the transaction, and that he would be permitted to share in the profits expected to be derived from the stock acquisition and following merger.

In February, 1971 Zimmer as seller and Gelt as buyer entered into a written contract in Arizona, which contract had been prepared at the instance of Gaffney. The contract involved the use of an Arizona bank as an escrow agent.

The contract provided for the sale of the stock for $300,000.00. Of that sum $50,-000.00 was to be paid over in cash to the escrow agent at the time of the contract; the balance of $250,000.00 was to be evidenced by three promissory notes executed by Gelt. The first of those notes was in the sum of $37,000.00, and it was due and payable on July 1, 1971; the other two notes were each in the sum of $106,500.00 falling due respectively on July 1, 1972 and July 1, 1973. It was stipulated that payment of each of the two $106,500.00 notes was to be unconditionally guaranteed by a commercial bank.

The escrow agreement was supposed to be closed on July 1, 1971. At that time Zimmer was supposed to deliver the stock certificates to the escrow agent and the agent was to pay over to Zimmer the $50,-000.00 in cash in the hands of the agent and the $37,000.00 evidenced by the first note, assuming that the agent had by that time received payment of that note; and the escrow agent was also supposed to deliver the two $106,500.00 notes to Zimmer. The agent was to receive a fee of $2500.00 for its services.

It was agreed the shares were not to be transferred immediately on the books of IBIC, and it was agreed that pending such transfer the seller would vote the stock in accordance with the wishes of the buyer.

The initial $50,000.00 was paid over to the escrow agent by Gelt out of his own funds. Gelt also executed the $37,000.00 note and the two $106,500.00 notes which, at the instance of Sack, had been guaranteed by the York State Bank of York, Nebraska, which was controlled by Sack and his father.

It was understood that money would have to be borrowed from some source or sources to pay off the Gelt-Zimmer notes mentioned in the agreement, and Sack advised Gelt that the former would arrange the financing. As indicated, Gelt was assured that he would be saved harmless in connection with the over-all transaction.

By September 21, 1971 the $37,000.00 note called for by the contract was due or perhaps past due. On or about that date Sack caused Educators to make a $90,000.00 loan to Gelt. A note in that amount was prepared in Nebraska which showed Gelt as maker and Educators as payee; there were no other parties to the instrument. The note was mailed to Gelt in Arizona and was executed by him in that state; he then mailed the note back to Sack in Nebraska. Sack then caused Educators to transmit out of its own funds in Nebraska to Gelt in Arizona the face amount of the note. Gelt used the proceeds of that loan to pay off the $37,000.00 note and apparently to reimburse himself for the $50,000.00 that he had paid over to the escrow agent originally.

After September 21, 1971, Superior Benefit and Educators were merged into Pioneer. By September 21, 1972 no part of the 1971 note payable to Educators had been paid, and on September 21, 1972 Sack caused a renewal note in favor of Pioneer to be prepared and mailed to Gelt in Arizona; Gelt executed that note which was in the sum of $97,200.00, including accrued interest, and mailed it back to Nebraska. That is the note in suit here.

The $106,500.00 note that fell due on July 1, 1972 was retired out of the proceeds of a loan made to Gelt at the instance of Sack by the National Bank of Commerce Trust & Savings Association of Lincoln, Nebraska, which note was guaranteed by Sack and his wife. The $106,500.00 note that fell due on July 1, 1973 was paid off by the York State Bank which had guaranteed its payment originally.

In due course IBIC was merged into Superior Equity, and the shares of IBIC were converted into Superior Equity shares. The merger was of immediate benefit to Superior Equity and presumably was of benefit to the insurance companies owned by it, but the benefit was temporary. Superior Equity fell upon evil days and is no longer a functioning corporation. Nor is Pioneer any longer an operating insurance company, and its assets and receivables and its outstanding insurance policies have all been transferred to an independent company formed at the instance of the Insurance Department of the State of Nebraska.[1]

None of the 100,000 shares of stock that Gelt ostensibly bought from Zimmer ever came into Gelt's hands, nor was Gelt ever issued any Superior Equity stock on the basis of the IBIC shares. Gelt does hold some Superior Equity shares which he acquired independently. The district court found that those shares are virtually worthless and probably will remain so.

This suit was filed in 1974. For the sake of completeness we will say that the overall record before us reflects that in 1975 the National Bank of Commerce Trust & Savings Association filed a suit against Gelt and his wife and Sack and his wife in federal court in Arizona to recover on the note executed in favor of that bank by Gelt and guaranteed by Sack. And the record also reflects that in 1976 Gelt filed his own suit in federal court in Arizona against Superior Equity, the York State Bank, the National Bank of Commerce Trust & Savings Association, above mentioned, Pioneer, Sack and his father, and Gaffney. Jurisdiction of that suit is based upon federal securities laws and regulations and seeks damages in the sum of $1,850,000.00 plus other relief including a judgment invalidating the judgment rendered by the district court in this case. The present status of those suits is unknown.

In stating the facts of the case we have taken into consideration certain materials appearing in the record that was made up in connection with Gelt's motion for relief from judgment, which materials were not before the district court when the case was tried originally.

## I.

We take up, first, the question of whether the district court had in personam jurisdiction of the defendant.

Plaintiff relies for jurisdiction on Neb. Rev.Stat. §§ 25–536(1)(a) and (2) and 25–537. Section 25–536(1) provides that a court may exercise jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's "(a) Transaction of business in this state. . . ."[2] Section 25–536(2) provides that when jurisdiction over a person is based solely on § 25–536, only a cause of action

---

1. That development with respect to the affairs of Pioneer caused the defendant to file a motion for a continuance alleging that there was a material question as to whether Pioneer is a real party in interest. That motion was denied by the district court, but the defendant has not assigned that action as error.

2. Other categories of conduct which may subject a person to jurisdiction that are set out in § 25–536(1) do not appear to be applicable to this case.

arising from acts enumerated in the section may be asserted against him.

Section 25–537 provides that when the exercise of personal jurisdiction over a person is authorized by the statute, he may be served with process outside the borders of the state.

■ Long-arm statutes like that of Nebraska have been devised to take advantage of the constitutional principles laid down in the leading case of *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Those principles are that a state may constitutionally exercise in personam jurisdiction with respect to a person if he has such minimum contacts with the state "that the maintenance of the suit [will] not offend 'traditional notions of fair play and substantial justice,'" 326 U.S. at 316, 66 S.Ct. at 158, and that the demands of due process are met by such contacts of the person with the forum state "as [to] make it reasonable, in the context of our federal system of government, to require [him] to defend the particular suit which is brought there." *Ibid.* at 317, 66 S.Ct. at 158. There are, of course, constitutional limits beyond which the concept of *International Shoe* cannot be extended. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

■ Subject to the limitations of due process we give to a state long-arm statute the same construction that the courts of the state have given to it, *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 637 (8th Cir. 1975); *Caesar's World, Inc. v. Spencer Foods, Inc.*, 498 F.2d 1176, 1179 (8th Cir. 1974). In *Stucky v. Stucky*, 186 Neb. 636, 185 N.W.2d 656 (1971), it was recognized that the Nebraska Legislature in adopting §§ 25–536 and 537 had embraced the concept of *International Shoe*; and the federal courts in Nebraska have construed the statute as being as broad as "the constitutional standard of due process." *Aaron Ferer &*

*Sons, Inc. v. Atlas Scrap Iron & Metal Co.*, 418 F.Supp. 674, 679 (D.Neb.1976).[3]

■ In *Electro-Craft Corp. v. Maxwell Electronics Corp.*, 417 F.2d 365, 368 (8th Cir. 1969), this court listed five factors that are to be considered in determining whether a forum state can exercise in personam jurisdiction over a non-resident or a foreign corporation. Those factors are (1) the nature and quality of the contacts within the forum state; (2) the quantity of contacts within that state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

In *Thompson v. Ecological Science Corp.*, 421 F.2d 467, 469 (8th Cir. 1970), the fourth and fifth factors listed above were characterized as "secondary," and the court then went on to say: "Of course, these factors must be applied to each case in light of their own facts. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952)." And, in *Caesar's World, Inc. v. Spencer Foods, Inc.*, supra, 498 F.2d at 1180, it was said: "These factors do not establish a mathematical formula from which to derive fair play and substantial justice, but rather provide a general guide in applying that abstract concept."

■ We are not prepared to say that every transaction involving the making of a loan by a lender in a forum state to a citizen or resident of some other state subjects the borrower to the *in personam* jurisdiction of the courts of the forum state merely because the loan is to be repaid in that state or because money is transmitted out of that state to the borrower. We think, however, that the principles that have been stated are generally applicable to loans of money or extensions of credit. If in connection with a particular loan sufficient minimum contacts between the bor-

---

**3.** In the separate cases that give rise to that opinion Judge Denney held on the particular facts before him that the causes of action asserted by the local plaintiff did not arise out of

contacts between the non-resident defendants and Nebraska sufficient to satisfy due process, and he dismissed the complaints. An appeal from the ruling is now pending in this court.

rower and the forum state are developed to satisfy the requirements of due process, the borrower may be subjected to the jurisdiction of the forum under a local long-arm statute, otherwise not. As indicated, each case must be decided in the light of its own facts and circumstances, and it appears to us that a number of factors are to be considered, and that they are not necessarily limited to the physical contacts between the borrower and the forum state but include such factors as the nature, size and purpose of the loan, and perhaps other factors as well. And ultimately, the question is whether in a particular case the facts and circumstances are such as to make the subjection of the borrower to the jurisdiction of the forum court offensive to "traditional notions of fair play and substantial justice."

As to the instant case, we recognize that the negotiations that led up to the agreement between Gelt and Sack and to the agreement between Gelt and Zimmer all took place in Arizona. We also recognize that all of Gelt's dealings were with Sack, rather than with Educators or Pioneer, and that there were no physical contacts between Gelt and Nebraska as far as the original note and the renewal note were concerned. On the other hand, it must be recognized not only that the notes were payable in Nebraska but also that the $90,-000.00 loan that was made by Educators was part of an over-all transaction that was designed to affect, for better or for worse, a holding company, the business of which was centered in Nebraska, and the Nebraska insurance companies that were owned by the holding company.

More basically, it must be kept in mind that as far as the acquisition of the IBIC stock was concerned, Sack and Gelt were engaged in a joint venture, and that Gelt was to share in the profits that the two men hoped to gain from the venture. If the venture was not to abort funds had to be provided to Gelt to pay off his notes to Zimmer as they fell due. It was the duty of Sack to attend to the financing that Gelt would require to discharge his obligations on those notes. Thus, when Sack, acting in Nebraska, caused Educators to make the

loan to Gelt and to transmit the loan proceeds to him, Sack was acting not only for himself but also on behalf of the joint venture, and it is elementary that one member of a joint venture acting for the venture is acting as the agent of the other member or members.

■ When all of the circumstances in the case are considered together, we see nothing unfair or unreasonable in requiring Gelt to litigate his obligation on the Educators' note and on the later Pioneer note in Nebraska rather than in Arizona. And we hold that there were sufficient relevant and significant contacts between Gelt and Nebraska in connection with the obligation in question to subject him to the jurisdiction of the Nebraska courts.

Hence, the district court did not err in overruling Gelt's motion to dismiss the complaint.

## II.

Passing to the merits of the case as they were submitted to the district court in April, 1976, it is to be observed that the defendant did not contend at that stage that the note that he executed in favor of Educators or the renewal note that he executed in favor of Pioneer had been obtained by fraud or was the result of any fraudulent conspiracy.

As far as his own liability was concerned, he simply contended that he was an "accommodation maker" of the notes and for that reason was not liable to Pioneer on the renewal note.

■ Under the Uniform Commercial Code, as it has been adopted in Nebraska, an accommodation party is not liable to the accommodated party, and if the accommodating party discharges the obligation, he has a right of recourse on the instrument against the accommodated party. Neb.Rev. Stat., Uniform Commercial Code, § 3–415(5). Section 3–415(1) defines an accommodation party as one who signs an instrument in any capacity for the purpose of "lending his name to another party to it."

And § 3–415(2) provides that when an instrument has been taken for value before it is due, an accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

■ Both the original note and the renewal note were executed by Gelt as maker and the respective insurance companies appeared as payees. There were no other parties to the instruments. Thus, Gelt did not "lend his name" to any other parties to the instrument and was not an "accommodation maker." Additionally, Educators took the first note for value before it was due, and Pioneer gave value when it took the renewal note.

■ While there is no doubt that Gelt executed the instruments as an accommodation to Sack, that did not make him an "accommodation party" within the meaning of § 3–415(1) and (5).

Gelt argues further that even if he was not an "accommodation maker," he gave the note for a special purpose known to Educators and later to Pioneer, and that it was understood that Sack was to discharge the obligation and that in no event was Gelt to be called upon to do so.

■ It may be conceded that where the maker of a note receives no value therefor and makes and delivers the note to another for a special purpose such as use by the payee as collateral for a loan, and where the parties do not intend for the maker to be liable to the payee, the former is not liable. In that situation as between maker and payee there is simply no consideration for the contract, the maker derives no benefit and the payee suffers no detriment.

■ But that situation is not presented here. As has been seen, Gelt received value for the note, and the note was supposed to be paid. Of course, it made no difference to Educators or Pioneer whether the payment was made by Gelt or whether it was made by Sack or by someone else for that matter. From that, however, it simply does not follow that Gelt was not liable on the respective notes if Sack did not pay them.

■ The theory of Gelt on his counterclaim against pioneer was that that company and Superior Equity were the alter egos of each other, that Pioneer was liable for the obligations of Superior Equity, and that Sack's promise to hold Gelt harmless was made on behalf of Superior Equity and was binding on that company.

In dismissing the counterclaim the district court found specifically that when Sack made the hold harmless agreement, he was acting for himself alone and not as the agent of any of the companies in which he was interested, and the district court also found that Superior Equity and the three insurance companies were "separate and viable corporations, none being the alter ego of the other."

Those findings have substantial evidentiary support and are not clearly erroneous.

The original judgment of the district court is affirmed.

### III.

It is now necessary to determine whether the district court erred in overruling Gelt's motion for relief from that judgment.

■ Insofar as here pertinent Rule 60(b) provides that on motion and upon such terms as may be just a district court may relieve a party or his representative from a final judgment, order or proceeding on any one or more of a number of specified grounds, including ". . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . or (6) any other reason justifying relief from the operation of the judgment. . .." A motion under Rule 60(b) must be filed within a reasonable time and if based upon grounds (2) and (3), *supra,* not later than one year after the rendition of the judgment.

Where, as here, a motion for relief from judgment under Rule 60(b) is filed during

the pendency of an appeal from the underlying judgment, the question has arisen as to the jurisdiction of the district court to pass upon the motion. The problem is discussed in 11 Wright & Miller, Federal Practice & Procedure, Civil, § 2873.

■■■ While there may be some conflict in authority, the better rule, and the one that we approve, is that in such a situation the district court has jurisdiction to consider the motion and if it finds the motion to be without merit to enter an order denying the motion, from which order an appeal may be taken. That was the procedure that was followed here. If, on the other hand, the district court decides that the motion should be granted, counsel for the movant should request the court of appeals to remand the case so that a proper order can be entered. 11 Wright & Miller, *supra*. *See also* 7 Moore's Federal Practice, ¶ 60.-30(2), (2d ed.), and the thorough opinion of the court in *Lairsey v. Advance Abrasives Co.*, 542 F.2d 928 (5th Cir. 1976).

■■■ Since the district court denied Gelt's motion after consideration, it acted within its jurisdiction, and No. 77–1262 is properly before us.

The motion is based on the fact that prior to the merger of Superior Equity and IBIC those corporations issued a joint proxy statement to the stockholders of both companies, including Gelt, which, according to Gelt, omitted certain material facts and thus amounted to a fraud on the stockholders and also on the Securities & Exchange Commission. Gelt contends that the falsity of the statement was not discovered prior to the trial and could not have been discovered with reasonable diligence prior to the trial or within the time limited for the filing of a motion for a new trial under Rule 59. Gelt also contends that through-

out the proceedings Pioneer and counsel for Pioneer have known about the falsity of the statement and that their failure to disclose it to Gelt's counsel and to the district court amounted to a fraud not only upon Gelt but also upon the court.

The district court dealt with the motion in a memorandum opinion that was filed on February 27 of the current year. That court found from a preponderance of the evidentiary material before it that Gelt and his original attorney were either aware of the existence and contents of the statement prior to the trial or would have been aware of them had reasonable diligence been used. And the district court also found that although a fraud may have been committed upon Gelt, it did not affect the validity of the judgment that had been entered. Judge Urbom was evidently of the view that present counsel for Gelt was simply trying to use Rule 60(b) as a means of reopening the case for the purpose of advancing a new defense theory which had not been tendered originally.[4]

■■■ A Rule 60(b) motion addresses itself to the discretion of the district court, and an appellate court will not disturb the exercise of that discretion in the absence of abuse. *Lohman v. General American Life Ins. Co.*, 478 F.2d 719, 722 (8th Cir. 1973); *Hale v. Ralston Purina Co.*, 432 F.2d 156, 159 (8th Cir. 1970); 11 Wright & Miller, *supra*, § 2587. And it has been said that a motion for relief from judgment involves "a nice balance between the interest in finality and the desire to achieve justice." 11 Wright & Miller, *supra*, § 2872 at 261.

■■■ We have given careful consideration to this phase of the case. When the issues were framed originally and when the case was tried, Gelt was represented by counsel of his own choice. In our opinion

---

4. It appears to us that the defense theory that would be urged by Gelt in this case should the judgment of the district court be set aside may well be incorporated in the pleadings that Gelt has filed in the two cases now pending in federal court in Arizona that have been mentioned. Gelt's answer and counterclaim directed at the first amended complaint filed by the National Bank of Commerce was filed by his present attorney in this case after the district court's judgment had been rendered. And Gelt's own suit in Arizona was not filed until after rendition of the judgment in this case. Interestingly enough, Gelt's pleading in the suit against him was signed by his present attorney in this case; Gelt's own complaint was filed by that attorney and also by the attorney who represented him originally in this case.

Gelt had his full day in court, and the district court did not err or abuse its discretion when it refused to set aside its original judgment.

Affirmed on both appeals.