**NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent for Zionic Federal Credit Union, Plaintiff,**

**v.**

**James A. CHRISTENSON, Trustee of the R.O. Herbert Trust, et al., Defendants.**

**Nos. 85–1074C(1) to 85–1080C(1).**

United States District Court, E.D. Missouri, E.D.

Jan. 3, 1986.

Gary H. Feder, St. Louis, Mo., for plaintiff.

Mark T. Keaney, St. Louis, Mo., for defendants.

### MEMORANDUM

NANGLE, Chief Judge.

Six of the seven cases consolidated in this action are now before this Court on defendants' motions to quash service of process, to dismiss for improper venue and to dismiss for lack of personal jurisdiction, or in the alternative, to transfer under 28 U.S.C. § 1404(a). For the reasons stated herein, all of defendants' motions are denied.

These cases represent a small portion of the lawsuits arising out of the insolvency and subsequent liquidation of the Zionic Federal Credit Union (Zionic). There is little disagreement over the basic facts surrounding the transactions which transpired between the parties to these lawsuits. The parties are in disagreement over the legal significance of their actions.

Zionic, a Missouri credit union, operated originally from offices in Bridgeton, Missouri and then later from St. Charles, Missouri. On June 6, 1984, Zionic was found to be insolvent and was placed into involuntary liquidation by the National Credit Union Administration Board (NCUAB) pursuant to 12 U.S.C. §§ 1766(b) and 1787(a)(1). The NCUAB was required to pay the insured depositors from the National Credit Union Share Insurance Fund as required by federal law. 12 U.S.C. § 1787(c)(1). In addition, the NCUAB, pursuant to 12 U.S.C. § 1787(a)(1), appointed itself liquidating agent for Zionic. As the liquidating agent, NCUAB is charged with collecting the assets of the failed credit union. The funds recovered are ultimately to be distributed to the creditors of Zionic, the Share Insurance Fund and the remaining uninsured depositors. All of the seven cases, consolidated by this Court's Order of July 22, 1985, concern loan transactions involving National Heritage Corporation (NHC), James A. Christenson [1] and individual members of the Herbert family (the Herbert defendants). The motions which are the subject of this Order relate only to the actions against NHC and the Herbert defendants.

NHC is a South Carolina corporation with its principal place of business also in South Carolina. Richard O. Herbert, as president of NHC, sought to reorganize the debt structure of NHC, a family business. The company operates a cemetery business with properties located in North Carolina, South Carolina and Georgia. Richard Herbert, in his affidavit, states that during the late summer or fall of 1982, he was contacted in his office in Anderson, South Carolina by Mr. Mel Lanius. According to Mr. Herbert, Mr. Lanius was seeking reputable borrowers to take out loans from a bank associated with the Reorganized Church of Latter Day Saints. Mr. Herbert was subsequently contacted by James A. Christenson, attorney for Zionic, who stated that Zionic Federal Credit Union of St. Louis, Missouri, would be making the loans for the church. Mr. Christenson also requested that Mr. Herbert's South Carolina attorneys prepare the necessary documentation for the loans. On December 3, 1982, Mr. Lanius and Mr. Christenson came to South Carolina and executed notes for a total amount of $200,000.00. Mr. Herbert also states that he was presented with a check

---

1. Christenson has made no entry of appearance nor has he filed any pre-trial motions or answered the complaint. According to the Herbert defendants, he is believed to be in Honduras.

in the amount of the notes.[2] Finally, Mr. Herbert states that Mr. Christenson explained that it was necessary to issue the loans in the name of individuals until Zionic obtained approval to make corporate loans, but that no individual would be personally liable for any loss on the notes.

The notes signed on December 3, 1982, with the exception of the names of the makers, guarantors and witnesses and the account numbers[3] are identical. They all state that payments are to be made to Zionic Federal Credit Union, located in St. Louis, Missouri. In the collateral section, the notes state the following; "stock in cemetery company, accounts receivable $400,000.00 and guarantees".

Subsequent to December 3, 1982, a number of additional loans were signed by individual members of the Herbert family for the benefit of NHC. The Herbert Family defendants each state that the loans were necessary to allow NHC to reorganize its debt structure. The parties do not dispute that all proceeds from the loans to the Herbert defendants were in fact used in the family business. The Herbert defendants further state that it was their understanding that it was necessary for the loans to be carried in individual names because Zionic had no authority to make loans to corporations, but that there would be no personal liability on the notes. The Herbert defendants state that the loans were all signed in South Carolina and that they never traveled to Missouri in connection with those notes. In their answers to interrogatories however, Richard, Marie and Jeffrey Herbert state they made a total of ten trips to St. Louis during the period from April, 1983 to August, 1984. The purposes of their trips were to discuss finances, banking arrangements and to execute a trust agreement.

In addition to the loans made to the Herbert defendants, a number of other loans were made to James A. Christenson as trustee of The R.O. Herbert Trust (Herbert Trust). The Herbert Trust arises out of a complex financing arrangement which is outlined in what is referred to as the Unitrust Agreement.[4] The Unitrust Agreement was executed by Richard and Marie Herbert on or about April 26, 1982 in St. Louis, Missouri. According to NCUAB, Richard Herbert set up two Missouri corporations, National Family Institute, Inc., and National Financial Management Corporation.[5] Under the terms of the Unitrust Agreement, capital and common stock of NHC as well as certain rights of action and

**2.** The following notes were executed on December 3, 1982; note number 82–143 for $50,000.00 signed by Richard O. Herbert, case number 85–1079C(1); note number 82–144 for $50,000.00 signed by Marie E. Herbert with Richard O. Herbert as guarantor, case number 85–1077C(1); note number 82–145 for $50,000.00 signed by Kent A. Edmonds (son-in-law of Richard O. Herbert) with Richard O. Herbert as guarantor, case number 85–1080C(1); and note number 82–146 for $50,000.00 signed by Judy Herbert Edmonds with Richard O. Herbert as guarantor, case number 85–1078C(1).

**3.** According to the defendants' affidavits, these notes were drafted by the Herbert family's lawyers in South Carolina. It is clear that the parties who drafted the notes contacted Zionic at some point to obtain the proper note and account numbers and to determine the amount of collateral required.

**4.** The Unitrust Agreement, dated April 26, 1983, consists of a Trust Agreement and a Transfer Agreement. It is obvious from the terms of the Unitrust Agreement that the Herberts sought to obtain more favorable tax treatment for their family business. On or about August 8, 1984, various members of the Herbert family executed a document titled "Acknowledgment and Confirmation" which purports to void the Trust and Transfer Agreements.

**5.** The Transfer Agreement states that National Family Institute, Inc., and National Financial Management Corporation are Missouri corporations. According to plaintiff, at one time the two corporations operated out of the same office as Zionic Federal Credit Union in Bridgeton, Missouri. The Trust and Transfer Agreements are signed by Richard O. Herbert as transferor, Howard Fisher as president of National Family Institute, Inc., James Christenson as president of National Financial Management Corporation and Marie E. Herbert as beneficiary. Defendants do not dispute that these were Missouri corporations nor do they dispute the validity of the Unitrust Agreement. Under its own terms, the trust administration and the rights of the parties are governed by Missouri law.

notes receivable which belonged to Mr. Herbert were transferred to National Financial Management Corp. The Unitrust Agreement designates National Financial Management Corp. as trustee of the Herbert Trust.

James A. Christenson, as president of National Financial Management Corp., signed for loans from Zionic amounting to $624,064.00. These notes are the subject of the suit filed by plaintiff numbered 85–1074C(1). The Herbert defendants claim Christenson made loans to himself and never accounted to the Herbert Trust or NHC for the funds borrowed. The Herbert family defendants sought reconsideration of this Court's order consolidating the Christenson case with the six other cases that involved individual members of the Herbert family and NHC.[6] That motion was denied by this Court on the basis that all seven cases are the result of a series of loans involving the Herbert Trust, the Herbert family and their South Carolina business, National Heritage Corporation.

In the six cases, involving members of the Herbert family, the defendants filed affidavits in which they admit signing the notes for the loans in question. They also state that they are South Carolina citizens, that the notes were all signed in South Carolina and that James Christenson informed them that there would be no personal liability on these notes. The Herbert defendants have filed motions in these six cases to quash service, to dismiss for improper venue and for lack of personal jurisdiction, or in the alternative, to transfer under 28 U.S.C. § 1404(a). Upon review of the pleadings and affidavits submitted by the respective parties, this Court must deny all of defendants' motions.

■ Defendants seek to quash service of process for the reason that plaintiff failed to "plead the applicability of any provision in Rule 4(e) [*Fed.R.Civ.Pro.*] authorizing out of state service." Defendants have not cited any case law, nor is this Court aware

of any requirement that plaintiff plead the basis for out of state service in its complaint. Accordingly, defendants' motion to quash service must be dismissed.

■ Defendants next seek to dismiss plaintiff's complaint on the basis that venue is improper. Defendants argue that the signing of the notes in South Carolina necessitates a finding that the claim arose in South Carolina. This Court cannot agree. The source of the funds in this case was Zionic Federal Credit Union, located within the Eastern District of Missouri. That fact is clearly stated at the top of every note involved in these lawsuits. Moreover, the payments made on the notes were sent to Zionic Federal Credit Union, and the alleged breach of the loan agreements occurred, if at all, within this district. There are additional factors which support this Court's conclusion that venue is proper in this district. The Herbert family established two corporations and a trust within this state as part of the loan financing program. While subsequent documents may have voided the Unitrust Agreement, this Court cannot ignore the relationship of these transactions to the Herbert family and their South Carolina business, NHC. For these reasons, this Court finds that the cause of action in all of these cases arises in Missouri and therefore venue is proper within this district.

Defendants next seek dismissal of the six complaints for lack of personal jurisdiction. Defendants state in their affidavits that the notes were all executed and delivered in South Carolina and at no time did they ever go to Missouri in connection with these notes. Defendants contend that there is no basis for asserting long-arm jurisdiction over them. This Court disagrees.

■ In passing on a motion to dismiss for lack of jurisdiction over a non-resident, a federal diversity court is required to engage in a two-step inquiry: first, whether defendant committed one of the acts enu-

---

**6.** These six cases are numbered 85–1075C(1), 85–1076C(1), 85–1077C(1), 85–1078C(1), 85– 1079C(1) and 85–1080C(1).

merated in the long-arm statute; and second, whether the exercise of personal jurisdiction over defendant violates the due process clause of the fourteenth amendment. *The Land-O-Nod Company v. Bassett Furniture Industries, Inc.*, 708 F.2d 1338 (8th Cir.1983); *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309, 312 (8th Cir.1982). Plaintiff, the party that is seeking to invoke federal jurisdiction, has the burden of establishing that jurisdiction exists, and this burden may not be shifted to the party challenging the jurisdiction. *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 653 (8th Cir. 1982). While the facts are viewed in the light most favorable to the plaintiffs, "there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist. . . ." *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir.1977) (citations omitted). *See also Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977) (plaintiff need only make a prima facie showing of jurisdictional facts through submission of affidavits plus discovery materials); *Greycas, Inc. v. Anderson*, 584 F.Supp. 894, 895–96 (E.D.Mo.1984); 4 Wright & Miller, *Federal Practice and Procedure* § 1068 at 250 (1969).

Missouri's Long-Arm statute provides in part:

1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:

(1) The transaction of any business within this state;

(2) The making of any contract within this state;

(3) The commission of a tortious act within this state;

(4) The ownership, use, or possession of any real estate situated in this state;

(5) The contracting to insure any person, property or risk located within this state at the time of contracting.

(6) Engaging in an act of sexual intercourse within this state with the mother of a child on or near the probable period of conception of that child.

2. . . . .

3. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

Mo.Rev.Stat. § 506.500 (Supp.1984).

The due process clause of the fourteenth amendment places limits upon the power of a court to exercise personal jurisdiction over a non-resident defendant. The due process clause requires that a defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Land-O-Nod*, 708 F.2d at 1340. *Accord World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (citations omitted). *See also Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The defendant's contacts with the forum state must be purposeful and such that defendant "should reasonably anticipate being haled into court there." *World Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567. *See also Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

In this circuit, the due process standard has devolved into a consideration of five factors:

(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977). *See Land-O-Nod*, 708 F.2d at 1340. The first three factors are of primary importance and the last two are of secondary importance. *Id.*

In applying this analysis to the case at bar, this Court finds the exercise of personal jurisdiction over the Herbert defendants and NHC to be proper. Defendants seek to separate their conduct into individual acts, thus minimizing their contact with the State of Missouri. Viewed as a whole, however, it becomes clear that all of the defendants were part of a plan to transact business and make contracts within this state. The defendants have not disputed that two Missouri corporations, National Family Institute and National Financial Management Corp. were established as part of the loan financing arrangement. Nor have the defendants disputed the fact that the funds borrowed from a Missouri credit union were necessary to reorganize the debt structure of their South Carolina business, NHC. In fact, as previously stated, the Unitrust Agreement, signed by members of the Herbert family, provided that ownership and control of NHC would be turned over to one of the Missouri corporations. Defendants' position that their conduct consisted of mere "perfunctory" execution of notes in South Carolina is unsupported by the facts of this case. This Court finds that the defendants' conduct consisted of both making contracts and transacting business within this state. *See First National Bank of Kansas City v. Ward*, 380 F.Supp. 782, 784 (W.D.Mo.1974). Therefore, defendants' conduct is sufficient to subject them to service of process under the Missouri long-arm statute. Mo.Rev.Stat. § 506.500 (Supp.1984).

This Court must also examine the particular facts and circumstances of this case to determine whether the exercise of personal jurisdiction is offensive to "traditional notions of fair play and substantial justice." It is clear that simply an individual's contract with an out-of-state party, without more, is insufficient to establish minimum contacts in the other party's home forum. *Burger King Corp. v. Rudzewicz*, —— U.S. ——, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985). *See also Scullin Steel v. National Railway Utilization Corp.*, 676 F.2d 309, 313 (8th Cir.1982); *Pioneer Insurance Company v. Gelt*, 558 F.2d 1303, 1309 (8th Cir.1977). These defendants have done more. The establishment of the Missouri corporations as part of the financing arrangement demonstrates that the defendants have purposely availed themselves of the privilege of conducting activities within the state, thus invoking the benefits and protection of Missouri laws. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). All members of the Herbert family, who are defendants in these actions, stated in their affidavits that they have never traveled to St. Louis in connection with these loans. In responding to interrogatories submitted by NCUAB however, Richard, Jeffrey and Marie Herbert admitted that they made a total of ten trips to St. Louis during the period from April, 1983 to August, 1984. These three defendants state in their answers that the meetings were necessary to execute and later void the Unitrust Agreement, discuss banking arrangements and to discuss the general finances of NHC. These meetings demonstrate that the defendants, both individually and as officers and employees of NHC, have conducted a business relationship with Zionic in this state that lasted over several years. As this Court noted in *Greycas Inc. v. Anderson*, 584 F.Supp. 894, 896–97 (E.D.Mo. 1984), "[a] single meeting in this state has been held sufficient to satisfy the transac-

tion of business requirement of § 506.500." With these contacts, certainly defendants should have anticipated that failure to make payments on the loans to a Missouri bank would have consequences here. Moreover, these causes of action arises directly out of the contacts defendants have made with this state. The Supreme Court has held on numerous occasions that with respect to interstate contractual obligations, parties who create continuing relationships and obligations with citizens of another state "are subject to regulations and sanctions in the other state for the consequences of their activities." *Burger King Corp. v. Rudzewicz, supra,* 105 S.Ct. at 2182.

Defendants' principal argument is that they lacked physical presence in this state. As previously noted however, Richard, Jeffrey and Marie Herbert made several trips to St. Louis in connection with the finances of NHC. This Court finds little significance in the fact that three other defendants, Debra Herbert, Judy Herbert Edmonds and Kent Edmonds did not actually travel to Missouri. All the proceeds from the loans made to the Herbert defendants were for the benefit of NHC. Richard and Jeffrey Herbert are officers of NHC. Their visits to Missouri were no doubt for the benefit of both the corporation and the other members of the Herbert family. After having others travel to Missouri to protect their interest, defendants Debra Herbert, Judy Herbert Edmonds and Kent Edmonds cannot now deny their involvement in the business transactions. Moreover, it has been held by numerous courts that it is not a question of the physical presence of the defendant, but whether the act or transaction itself has a substantial connection with the forum state. Defendants may not avoid jurisdiction under these circumstances merely because they did not enter or do not reside in the forum state. *Burger King Corp. v. Rudzewicz, supra,* 105 S.Ct. at 2184. As explained, this Court finds defendants' conduct within this state to be substantial and therefore, sufficient to establish personal jurisdiction over each of the defendants in these actions. Accord-

ingly, defendants' motions to dismiss for lack of personal jurisdiction are denied.

■ Defendants' final motions are for transfer of venue under 28 U.S.C. § 1404(a). Section 1404(a) sets forth three factors to be considered in ruling on a motion to transfer: "For the [1] convenience of the parties and [2] witnesses, [3] in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (1976) (bracketed numbers added)." In addition, the Court will also look at such factors as the access to sources of proof, the availability of compulsory process for witnesses and the expense attendant to the production of said witnesses; "the relative advantages and obstacles to a fair trial". *J.F. Pritchard & Co. v. Dow Chemical of Canada, Ltd.,* 462 F.2d 998, 1000 (8th Cir.1972). The Eighth Circuit has stated that a change of venue, although within the trial court's discretion, should not be freely granted. "Courts are in the business of deciding cases, not playing procedural hockey among the available districts at the whim of dissatisfied parties." *In re Nine Mile Limited,* 692 F.2d 56, 61 (8th Cir. 1982).

■ This Court is in doubt whether it could transfer the lead case, 85–1074C(1), to South Carolina even if a motion to that effect had been filed. In that action, plaintiff named both James Christenson, as trustee of the Herbert Trust, and NHC as defendants. Section 1404(a) allows a transfer "to any other district or division where it might have been brought." The notes involved in 85–1074C(1) were apparently signed in St. Louis by James Christenson as trustee of the Herbert Trust. The place of residence of Mr. Christenson is unknown, as he has not entered an appearance in this suit. Therefore, this Court cannot say with any certainty that cause number 85–1074C(1) could have been brought in South Carolina. This Court, upon review of the facts of 85–1074C(1) believes that in the interest of judicial econ-

omy, the Christenson case should not be severed from the other six cases. The Herbert defendants, as officers and employees of NHC are inextricably bound up in the Christenson lawsuit. Certainly if the action in which NHC is a defendant were tried in St. Louis, the Herbert defendants would be necessary witnesses to explain the business transactions involving the family business. Even considering the six other cases separately however, this Court finds the balance of considerations to be in favor of retaining venue in this district.

The Herbert defendants claim hardship in traveling to Missouri for the trial of these cases. While this Court understands this problem, other factors must be considered. The employees and the records of the failed credit union, which constitute vital evidence in these cases, are located in Missouri. In addition, numerous suits have been filed in this district as a result of the insolvency of Zionic Federal Credit Union. In a large majority of these cases, the defendants assert the same defense put forth by the Herbert family—that they were told there would be no personal liability on the notes. As the exact circumstances of the failure of the credit union are developed in each of these cases, the courts in this district will develop a better understanding of the relevant facts and circumstances. This will result in a more efficient use of judicial resources.

Collectively, the Herbert family borrowed in excess of one-half million dollars from Zionic Federal Credit Union. When the loans signed by Mr. Christenson, as trustee of the Herbert Trust are included, the amount borrowed exceeds one million dollars. The failure of the credit union has caused great financial hardship to those who invested their money in Zionic. As a result, this state has a significant interest in trying these cases in this district. Defendants, having come to a Missouri bank to borrow large sums of money to restructure the debt of their family business, and having allegedly failed to repay the debt, have no justifiable complaint about being subjected to the judicial process of this federal court.