T.C. Memo. 2000-322

UNITED STATES TAX COURT

HENRY AND ESTHER MISLE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14157-97, 22920-97,     Filed October 16, 2000.
            16657-98, 16658-98.

Paul J. Peter, Gary J. Nedved, and Gary L. Young, for

petitioners Henry and Esther Misle.

Allen Daubman, M. Shaun McGaughey, and David M. Dvorak, for

petitioners HJA, Inc., & Subsidiaries.

Henry N. Carriger, for respondent.

---

[1]Cases of the following petitioners are consolidated
herewith for purposes of trial, briefing, and opinion because
they present common questions of fact and law:  HJA, Inc., &
Subsidiaries, docket No. 22920-97; Henry and Esther Misle, docket
No. 16657-98; and Henry Misle, docket No. 16658-98.  The cases
are referred to as this case in this opinion.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  In separate notices of deficiency, respondent determined the following income tax deficiencies, penalties, and additions to tax with respect to petitioners' Federal income tax returns:[2]

Henry and Esther Misle, Docket No. 14157-97

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------|
| 1989 | $19,906 | $3,981 |
| 1990 | 106,768 | 21,354 |
| 1991 | 66,964 | 13,393 |
| 1992 | 25,733 | 5,147 |
| 1993 | 31,803 | 6,361 |

Henry and Esther Misle, Docket No. 16657-98

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------|
| 1994 | $67,902 | $13,428 |
| 1996 | 71,900 | 14,380 |

Henry Misle, Docket No. 16658-98

| Year | Deficiency | Additions to Tax Sec. 6651(a) | Sec. 6654 |
|------|-----------|-----------------|-----------|
| 1995 | $62,797 | $15,591 | $3,422 |

_____

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

HJA, Inc., & Subsidiaries, Docket No. 22920-97

| Year | Deficiency |
|------|-----------|
| 1991 | $6,473 |
| 1992 | 83,578 |
| 1993 | 253,656 |

Following concessions,[3] the issues for decision are:

1. Whether payments made by HJA, Inc., in connection with an option and stock purchase agreement that were applied to certain liabilities are taxable to Henry and Esther Misle as ordinary income and deductible by petitioner HJA, Inc., & Subsidiaries;

2. whether petitioner Henry Misle may reduce, for income tax purposes, the gross amount of the option price paid to him or for his benefit pursuant to the option and stock purchase agreement by $150,000;

3. whether petitioners Henry and Esther Misle are liable for accuracy-related penalties for tax years 1989 through 1994 and 1996 under section 6662(a);

4. whether petitioner Henry Misle is liable for an addition to tax under section 6651(a) for failure to file a return for tax year 1995; and

---

[3]The parties have settled most of the issues raised in the notices of deficiency issued to petitioners. The only other issues to be resolved are computational.

5.  whether petitioner Henry Misle is liable for an addition to tax under section 6654 for failure to make estimated tax payments for tax year 1995.

## FINDINGS OF FACT[4]

Most of the facts have been stipulated and are so found. Stipulations of Fact Nos. 1 and 2 are incorporated into our opinion by this reference.

A.  Background

Petitioners Henry Misle (Henry or HM) and Esther Misle (Esther) are husband and wife who resided in Lincoln, Nebraska, at the time the petitions at docket Nos. 14157-97, 16657-98, and 16658-98 were filed.  HJA, Inc. (HJA), is a corporation which had its principal place of business in Lincoln, Nebraska, at the time the petition at docket No. 22920-97 was filed.  For the years at

---

[4]Contrary to Rule 151(e), which governs the form and content of briefs submitted to the Tax Court, petitioners Henry and Esther Misle failed to include, among other things, proposed findings of fact in their opening brief.  Instead, petitioners Henry and Esther Misle set forth their proposed findings of fact in their reply brief.  Presenting proposed findings of fact for the first time in a reply brief strips opposing parties of the opportunity to make objections to those proposed findings of fact.  Because petitioners Henry and Esther Misle failed to include proposed findings of fact in their opening brief, as required by Rule 151(e), we do not consider them.  By failing to follow the Court's Rules, "petitioners have assumed the risk that we have not considered the record in a light of their own illumination."  Monico v. Commissioner, T.C. Memo. 1998-10.

issue, HJA filed consolidated Federal income tax returns with its subsidiaries. The consolidated group is the petitioner in docket No. 22920-97.

During all relevant periods, members of the Misle family operated motor vehicle dealerships (the Misle dealerships) and related businesses (collectively the Misle group). The Misle dealerships were located on the north and south sides of O Street in Lincoln, Nebraska. Until 1990, the three Misle brothers-- Henry, Abram Misle (Abram or AM), and Julius Misle (Julius or JM)--were the primary family members involved in the operation of the Misle dealerships. Henry controlled and operated the dealerships on the south side of O Street through a corporation, Misle Chevrolet & Imports, Inc. (Chevrolet), and Abram controlled and operated the dealerships on the north side of O Street through a corporation, Park Place Pontiac-Cadillac-GMC, Inc. (Park Place). Julius operated other businesses in the Misle group.

B. The 1986 Reorganization

Before 1986, the Misle group operated through various partnerships and corporations, ownership of which varied from entity to entity. Effective August 14, 1986, the Misle group was reorganized under a unified corporate structure (the reorganization). A new holding company, HJA, and several subsidiary corporations, wholly owned either directly or

indirectly by HJA, were incorporated in connection with the reorganization. The subsidiary corporations owned the operating assets used in the Misle group. The prereorganization partnerships and corporations either were included in the new corporate structure or were dissolved and liquidated.

1.    Dissolution of the Misle Brothers Partnership

The Misle Brothers Partnership was one of the partnerships dissolved and liquidated as part of the reorganization. Pursuant to and in furtherance of the reorganization, Henry, Abram, and Julius executed a dissolution of partnership agreement dated April 14, 1986. In the dissolution of partnership agreement, Henry agreed to assume personal liability for $686,467 of intercompany loans owed by the Misle group to Chevrolet and another company in the Misle group (the Chevrolet debt).[5] Henry also agreed to hold Abram and Julius harmless and to indemnify them in the event they were ever required to pay any of the liabilities Henry agreed to assume.

2.    The Reorganization Documents

Various documents and agreements, described below, were entered into contemporaneously with the reorganization.

---

[5]According to the dissolution of partnership agreement, Abram and Julius collectively assumed personal liability for $2,224,942 of intercompany loans owed to Park Place and other businesses in the Misle group.

a.  Commercial Loan Agreement, FirsTier Notes,
Security Agreement, and Related Guaranties

FirsTier Bank (FirsTier), Chevrolet, BHM Corp. (BHM),[6] and Henry and Esther individually executed a commercial loan agreement dated June 30, 1986.  In accordance with the commercial loan agreement, Henry and Esther executed a $600,000 term note in their individual capacities payable to FirsTier dated June 30, 1986 (the FirsTier note), and a security agreement to secure the FirsTier note.  Chevrolet and BHM each executed separate guaranties of the FirsTier note.  During the years at issue, the FirsTier note was not included as a liability of HJA in HJA's books and records.

Chevrolet and BHM executed a separate $756,708 term note payable to FirsTier dated June 30, 1986 (the companies' term note), and a $100,000 revolving credit note payable to FirsTier dated June 30, 1986.  Chevrolet and BHM each executed a separate security agreement to secure the companies' term note and the revolving credit note.  Henry and Esther each executed an

_____

[6]BHM Corp. was a wholly owned subsidiary of Chevrolet that owned real estate on which Chevrolet operated.

individual guaranty of the companies' term note and the revolving credit note.[7]  The companies' term note was included as a corporate liability in HJA's books and records.

    b.  Escrow Agreement

Contemporaneously with the commercial loan agreement, Chevrolet, BHM, FirsTier, Henry, and Esther[8] executed an escrow agreement in which FirsTier agreed to hold the sum of $750,000 in escrow (the escrow fund) and to disburse the fund in accordance with the escrow agreement.[9]  The escrow fund consisted of $600,000 borrowed by Henry and Esther pursuant to the FirsTier note and another $150,000, the source of which was not described in the escrow agreement.  The escrow agreement provided that the escrow fund would be disbursed upon the execution and transfer of

_____

[7]In the ensuing years, the parties to these documents executed several amendments to the commercial loan agreement extending or modifying the companies' term note, the revolving credit note, and/or the FirsTier note (the notes).  All of the parties to the notes, including Henry, executed each amendment except that Henry did not execute a sixth amendment to commercial loan agreement dated Apr. 5, 1995 (the sixth amendment), and related documents.

[8]Bryan Misle and Laurie Misle, Henry and Esther's son and daughter-in-law, also signed the escrow agreement in their individual capacities; however, they were not referred to in the escrow agreement other than in one clause, which read, "WHEREAS, Borrowers [defined earlier in the document only as Henry and Esther] desires [sic] to execute all loan documents to be entered into by himself, Misle Chevrolet & Imports, Inc. and/or Bryan Misle".

[9]Both the commercial loan agreement, dated June 30, 1986, and the escrow agreement were executed on Aug. 12, 1986.

all documents in accordance with an agreement for contribution of assets, dated September 17, 1985, which was not made part of the record in this case.

The source of the additional $150,000 deposited into the escrow account was Henry's son, Bryan Misle (Bryan or BM).  Bryan refinanced some personal real estate to obtain the remaining $150,000 needed to complete the funding of the escrow.  On several occasions, both Henry and Bryan characterized the $150,000 transfer as a loan.[10]

### 3.  Ownership of HJA Following the Reorganization

Upon completion of the reorganization, Henry, Abram, and Julius each owned 10,000 shares of HJA common stock, representing a one-third ownership interest in HJA.

### C.  Henry's Sale of His HJA Stock

#### 1.  HJA's Option To Acquire Henry's Stock Under Exclusive Option Agreement

On March 15, 1990, HJA, Henry, Abram, Julius, and Bryan entered into an exclusive option agreement (EOA) pursuant to which Henry, in consideration for the payment of $300,000 (the

---

[10]In this litigation, Henry claimed that Bryan purchased some of Henry's HJA stock for $150,000 in 1990 and offered into evidence a stock certificate in support of his claim.  Although we admitted the stock certificate into evidence, petitioners failed to prove that it was a valid stock certificate or that it represented a genuine and completed sale.

option price), granted HJA the option to purchase Henry's stock in HJA for $1,030,000. The option price was to be paid as follows:

>    (i) The sum of Forty-Eight Thousand Six Hundred Fifty-Three and 62/100 Dollars ($48,653.62), already received by HM prior to execution of this Agreement;
>
>    (ii) The sum of One Hundred Seventy-Five Thousand Three Hundred Forty-Six and 38/100 ($175,346.38) at the time of the mutual execution and delivery of this Agreement;
>
>    (iii) Transfer and relinquishment by AM and JM of all of their right, title and interest in and to the securities currently in the possession of HM, valued at approximately Seventy-Six Thousand Dollars ($76,000.00).

Pursuant to the EOA, HJA transferred funds and assets with an aggregate value of $286,411[11] to Henry for the option to purchase his stock. The parties agree that $136,411 of this amount was investment income to Henry in 1990. The tax treatment of the remaining $150,000 is at issue in this case.

The EOA required that Henry's HJA stock be placed in escrow until the option to purchase Henry's stock was exercised and the sale closed. The EOA, however, gave Abram and Julius effective control over Henry's HJA stock beginning in March 1990.

---

[11]The parties agree that the amount actually paid was $286,411, despite language in the EOA stating that the aggregate option price was $300,000. The parties also agree that the entire payment is taxable in 1990. The only issue regarding the option payment is to whom the disputed balance of $150,000 is taxed.

## 2. The Restrictive Covenant

On the condition that HJA pay the option price to Henry as required by the EOA, Henry agreed to be bound by a restrictive covenant clause, which provided that Henry must not engage in competition directly or indirectly with HJA, Abram, Julius, Chevrolet, or Park Place for 5 years commencing on April 1, 1990 (covenant not to compete).[12]  In consideration for the covenant not to compete and as an inducement for Henry to enter into the EOA, HJA agreed to compensate Henry as follows:

> HJA shall pay to HM the sum of Two Million Eight Hundred Fifty-Two Thousand Dollars ($2,852,000.00), payable in one hundred twenty (120) equal consecutive monthly installments of Twenty-Three Thousand Seven Hundred Sixty-Six and 67/100 Dollars ($23,766.67) each, such payments to compensate HM for his agreement not to compete, as herein provided.

## 3. Related Agreements

In order to coordinate the covenant not to compete payments HJA owed to Henry with the payments Henry owed on the FirsTier note and the Chevrolet debt, the parties to the EOA entered into two additional agreements.  First, HJA, Henry, Abram, and Julius entered into a side letter agreement dated March 15, 1990 (the side letter agreement).  The side letter agreement provided for the establishment of a "sweep account" at National Bank of Commerce (NBC), into which the covenant not to compete payments

_____

[12]The parties have stipulated that the covenant not to compete is a legal and enforceable covenant under Nebraska law.

were to be deposited.[13]  Second, HJA, NBC, Henry, Abram, and Julius entered into an agreement dated August 27, 1990 (the sweep account agreement), which established the sweep account agreed upon in the side letter agreement.  The sweep account agreement required HJA to deposit the covenant not to compete payments ($23,767 per month for 120 months) into the sweep account.  It also required NBC to make specified disbursements of those deposited funds, including $7,999 per month to FirsTier and $6,393 per month to Chevrolet "until the obligation of HM is fully paid".[14]  The remainder of the sweep account funds was to be paid to Henry and to the appropriate Federal, State, and city income tax agencies to satisfy Henry's tax obligations resulting from the purchase of his stock and the covenant not to compete payments.

4.  The Sweep Account Payments

Pursuant to the EOA and the side letter agreement, HJA paid the option price to Henry and began to deposit the covenant not to compete payments into the sweep account.  HJA continued to

---

[13]Henry and Esther attached the side letter agreement to their 1992 Federal income tax return.

[14]The monthly payment to FirsTier under the sweep account agreement equaled the monthly payment required by the FirsTier note signed by Henry and Esther in their individual capacities, as modified by the Apr. 5, 1990, term note.  The monthly payment to Chevrolet under the sweep account agreement equaled the monthly payment Henry was required to make on the Chevrolet debt.

deposit the payments until January 1991 when a dispute arose among the parties to the sale.

5.  HJA's Exercise of the Option To Purchase Henry's Stock

Under the EOA, if HJA exercised its option, HJA was entitled to purchase Henry's 10,000 shares of HJA stock[15] for the sum of $1,030,000, payable in installments as provided in the EOA.  HJA exercised its option to purchase Henry's stock on or about January 11, 1991.

6.  The Baird, Kurtz Letter

Baird, Kurtz, & Dobson (Baird, Kurtz), the accounting firm for HJA and related companies for 25 years, was also Henry and Esther's personal accounting firm until 1990 and prepared their tax returns for the tax years up to and including 1989.  By letter dated April 10, 1990, Baird, Kurtz wrote to Henry to explain the tax consequences of payments to be made pursuant to the EOA (the Baird, Kurtz letter).[16]  The Baird, Kurtz letter advised, among other things, that, for tax purposes, (1) payments received from HJA for Henry's stock under the EOA would be treated as proceeds from the sale of a capital asset, and the

---

[15]Bryan did not assert any ownership interest in Henry's HJA stock in connection with the EOA.

[16]The letter was written by Robert K. Muehling, partner-in-charge of Baird, Kurtz, who knew Henry's financial situation. Henry claims that he never received this letter, although a copy of the letter was attached to Henry and Esther's 1992 income tax return.

resulting capital gain would be recognized using the installment sale method of accounting, and (2) the covenant not to compete payments made under the EOA, at $23,767 per month, would be taxed as ordinary income to Henry in the year received.  The Baird, Kurtz letter also stated with respect to the $150,000 from Bryan used to fund the escrow account that "It is our understanding that you [Henry] owe Bryan $150,000, which will be repaid in 1990.  Any additional amounts transferred to him [Bryan] would constitute gifts".  Baird, Kurtz attached a schedule to its letter entitled "CASH FLOW PROJECTIONS--HENRY MISLE" which assumed, among other things, that Henry's debts to Chevrolet and FirsTier would remain intact and would be amortized over 10 years and that Bryan would receive $150,000 from Henry in 1990 as repayment of Bryan's loan.

D.  State Litigation

In January 1991, disputes arose among HJA, Henry, Abram, and Julius relating to the EOA.  Sometime before January 21, 1991, HJA stopped making payments into the sweep account under the EOA.  On January 21, 1991, Henry and Bryan filed a lawsuit in the District Court of Lancaster County, Nebraska, against HJA, Abram,[17] and Julius, alleging breach of the EOA (the State litigation).  The defendants counterclaimed, alleging misrepresentation and a breach of covenants made by Henry in the

[17]During the course of the State litigation, Abram died and his estate was substituted as a party.

EOA. The primary issues in the State litigation were: (1) Whether the defendants breached the EOA by discontinuing payments into the sweep account, (2) whether the plaintiffs made misrepresentations when executing the EOA, and (3) whether Henry breached the covenant not to compete provision of the EOA.

The State litigation was tried from July 29 through August 1, 1996. Following the trial, a modified memorandum opinion and judgment (modified judgment), dated January 3, 1997, was entered by the State court in which the court held, among other things, that (1) the covenant not to compete was valid and enforceable, (2) Henry did not violate the covenant not to compete, and (3) HJA was obligated to complete the payment obligations under the covenant not to compete. The modified judgment was not appealed by any of the litigants.

Pending resolution of the State litigation, HJA continued to make payments directly on the FirsTier note and the Chevrolet debt. On December 29, 1997, the State court entered a journal entry pursuant to motions, filed by the defendants HJA and Abram, for an order nunc pro tunc and for partial satisfaction of judgment. The journal entry provided that HJA was entitled to a credit against the covenant not to compete payments for certain payments made by HJA on the FirsTier note and the Chevrolet debt. The journal entry stated, in part:

IT IS THEREFORE ORDERED and DECREED as follows:

- 17 -

* * * * * * *

2. That Defendants' Motion for Partial Satisfaction of Judgment for payments made to First Bank [FirsTier] and Park Place Chevrolet [Chevrolet] by Defendants from and after August 1, 1996 is granted with Defendant to be given credit on the Modified Judgment for the sum of $216,165.31 representing payments from September 1, 1996 through December 17, 1997 of $216,165.31.

* * * * * * *

4. To settle and resolve certain conflicts which have arisen in regards to the amount payable pursuant to the * * * Modified Judgment, the Parties, in open Court, have indicated their agreement to the following:

* * * * * * *

(b) The note of First Bank (f/k/a FirsTier Bank), referenced in the "side letter agreement," dated March 15, 1990, to which Henry Misle was an accommodating Party, has been paid by the Defendants, in full, without Henry Misle's knowledge or cooperation and the Defendants are due a credit on the Modified Judgment * * *;

(c) Between the dates of January 1 and January 8, 1998, the Defendants will cause to be retired the Park Place Chevrolet note, [Chevrolet debt] referenced in the "side letter agreement," which will satisfy said indebtedness of Henry Misle completely and the Defendants will be given a credit on the Modified Judgment * * *;

E.    HJA's Payments to or for the Benefit of Henry

During the years in issue, HJA made covenant not to compete payments to Henry or for his benefit in the following amounts:

Year                    Covenant not to compete payments[1]

| | |
|---|---|
| 1990 | $213,900 |
| 1991 | 182,088 |
| 1992 | 164,447 |
| 1993 | 176,503[2] |
| 1994 | 165,003 |
| 1995 | 166,410 |
| 1996 | 167,817 |

[1]The parties stipulated the amounts that HJA paid under the covenant not to compete, and those amounts are summarized here. The amounts listed for 1991, 1995, and 1996 differ from the amounts shown on the relevant Forms 1099 and in the letters of explanation. The amounts shown for 1994, 1995, and 1996 were paid by HJA and deducted, but respondent has not yet disallowed those deductions.

[2]In 1993, HJA made payments directly to FirsTier and Chevrolet in the amount of $165,003. HJA also made a direct payment to Henry in the amount of $3,000 and credited it as a covenant not to compete payment. In 1993, Chevrolet made an $8,500 payment on personal insurance for Henry and credited the payment as a covenant not to compete payment.

Part of the covenant not to compete payments was applied to the Chevrolet debt and the FirsTier note, either through the sweep account or directly, as follows:

| Year | Chevrolet debt | FirsTier note | Total |
|---|---|---|---|
| 1990 | $38,361 | $31,998 | $70,359 |
| 1991 | 6,394 | 7,999 | 14,393 |
| 1992 | 76,721 | 87,726 | 164,447 |
| 1993 | 76,722 | 88,281 | 165,003 |
| 1994 | 76,721 | 88,282 | 165,003 |
| 1995 | 76,722 | 89,688 | 166,410 |
| 1996 | 76,721 | 91,096 | 167,817 |

Part of the covenant not to compete payments ($17,000 in 1990[18] and $65,192 in 1991) was disbursed from the sweep account for other purposes. The parties agree that these amounts were ordinary income to Henry and Esther and deductible by HJA.

F.   Tax Treatment of Covenant Not To Compete Payments

For each taxable year 1990 through 1996, inclusive, HJA issued a Form 1099 and sent a letter of explanation to Henry that showed the amount of covenant not to compete payments made to Henry or for his benefit in that year. In 1990, Henry and Esther reported $161,036 of the $213,900 of the covenant not to compete payments as ordinary income.[19] Henry and Esther did not include any other covenant not to compete payments in income for any of the years at issue.

Henry and Esther claimed interest expense deductions on their joint individual Federal income tax returns for interest payments made on the Chevrolet debt as follows:

| Year | Interest deduction |
| --- | --- |
| 1989 | Unknown |
| 1990 | $43,440 |

---

[18]The parties agree that Henry is entitled to deduct, as an itemized deduction, the trustee fee of $500 paid in 1990 from the sweep account.

[19]The parties have agreed that the remainder of the 1990 convenant not to compete payments, which was not disbursed to Henry until 1991, was ordinary income to Henry in 1991.

Henry and Esther claimed interest expense deductions on their joint individual Federal income tax returns for payments made on the FirsTier note as follows:

| Year | Amount of deduction |
|------|---------------------|
| 1986 | Unknown |
| 1987 | $64,199 |
| 1988 | $57,987 |
| 1989 | Unknown |
| 1990 | $72,540 |

Henry and Esther did not claim interest deductions on the FirsTier note or the Chevrolet debt after 1990; however, they did continue to carry over their unused interest deductions from 1990 until at least 1996.

G.   Delinquent Returns of Henry and Esther

Henry and Esther filed their 1989, 1990, 1992, 1994, and 1996 Forms 1040, U.S. Individual Income Tax Return, late.  As part of their 1992 tax return, Henry and Esther filed a Form 8275, Disclosure Statement, with attachments.  Henry and Esther's 1996 return also contained a disclosure statement, but the statement was not made on Form 8275.

Henry failed to file an individual income tax return for 1995.

H.   Notices of Deficiency

Respondent examined Henry and Esther's 1990, 1991, 1992, 1993, and 1994 tax returns and prepared an "Individual Income Tax Return Substitute for Return" for Henry with filing status

"Married Filing Separate" for 1995. On April 9, 1997, respondent mailed Henry and Esther a notice of deficiency for 1989, 1990, 1991, 1992, and 1993. On August 28, 1998, respondent mailed Henry and Esther a notice of deficiency for 1994 and 1996. On August 28, 1998, respondent also mailed Henry a notice of deficiency for 1995. In the notices, respondent determined that the covenant not to compete payments were income to Henry. In the notice of deficiency for 1990, respondent also determined that Henry must report as income the remaining $150,000 of the option price transferred by Henry to Bryan.

Respondent also examined HJA's 1990, 1991, 1992, and 1993 tax years. After examining HJA's 1990 return, respondent proposed increasing HJA's taxable income, but the adjustment did not result in a deficiency because HJA had net operating losses that absorbed the additional income. For that reason, respondent did not determine an income tax deficiency for 1990 with respect to HJA.

On August 28, 1997, respondent issued a notice of deficiency to HJA for tax years 1991, 1992, and 1993, in which he disallowed HJA's deductions for the covenant not to compete payments. In so doing, respondent has taken inconsistent positions with respect to Henry and Esther, on the one hand, and HJA, on the other, in order to avoid the possibility of a whipsaw.

OPINION

I.  Whether Payments Made by HJA in Connection With an Option and Stock Purchase Agreement, Which Were Applied to the FirsTier Note and the Chevrolet Debt, Are Taxable to Henry and Esther as Ordinary Income and Deductible by HJA, Inc., & Subsidiaries

  A.  The Parties' Arguments

Henry and Esther contend, in effect, that any payments made by HJA on the FirsTier note and the Chevrolet debt, either directly or through the sweep account, did not result in taxable income to them because the payments did not qualify as covenant not to compete payments, nor did the payments relieve them of any primary liability under the FirsTier note and the Chevrolet debt. Rather, Henry and Esther contend that the payments were made by HJA to pay down HJA's own liabilities as to which Henry and/or Esther were only accommodation parties.  HJA disagrees, claiming that Henry and Esther were primary obligors as to the FirsTier note and that Henry was the primary obligor as to the Chevrolet debt; thus, payments made to FirsTier and Chevrolet by HJA from 1990 through 1996 are ordinary income to Henry and Esther and deductible by HJA.[20]

_____

[20]Respondent did not present an argument as to this issue and makes no assumptions as to Henry and Esther's status in relation to the loans.  Respondent concedes that if we hold that Henry and Esther are the primary obligors on the FirsTier note and the Chevrolet debt, then HJA is entitled to a full deduction for the payments that were applied to those liabilities, and Henry and Esther must include the payments as ordinary income on their tax returns.  Alternatively, respondent concedes that if Henry and Esther are determined to be accommodation parties on
(continued...)

With respect to the FirsTier note, Henry and Esther contend that payments made by HJA are not includable in their taxable income because: (1) A Nebraska State court already has held that Henry was merely an accommodation party on the FirsTier note and, therefore, the doctrine of collateral estoppel requires that this Court find he was not a primary obligor with respect to that debt, and (2) even if the doctrine of collateral estoppel does not apply, Henry was not the primary obligor on the FirsTier loan, and, therefore, he was not required to recognize income when the loan was repaid.

With respect to the Chevrolet debt, Henry and Esther argue that Henry was not the primary obligor because (1) the Chevrolet debt consisted of intercompany debts owed to Chevrolet by other companies in the Misle group; (2) when HJA, the successor parent corporation in the 1986 reorganization, paid off the Chevrolet debt, it was paying off its own debt, not Henry's debt; and (3) since Henry was not the primary obligor on the Chevrolet debt, HJA's repayment of that debt did not relieve Henry of any personal liability. Henry also argues that he did not receive

---

[20](...continued)
the FirsTier note and the Chevrolet debt, then HJA is entitled to a deduction only for the total amount of the covenant not to compete payments less the payments on the FirsTier note and the Chevrolet debt (with adjustments in related interest income and interest expense), and Henry and Esther must report a corresponding amount as ordinary income on their tax returns.

any of the intercompany loan money personally; rather, the money was borrowed to finance ongoing corporate operations.

B.  Collateral Estoppel Argument

Henry and Esther base their collateral estoppel argument solely on language in the State court journal entry, which stated in part:

> 4.  To settle and resolve certain conflicts which have arisen in regards to the amount payable pursuant to the * * * Modified Judgment, the Parties, in open Court, have indicated their agreement to the following:
>
> * * * * * * *
>
> (b)  The note of First Bank (f/k/a FirsTier Bank), referenced in the "side letter agreement," dated March 15, 1990, to which Henry Misle was an accommodating Party, has been paid by the Defendants, in full, * * * [Emphasis added].

HJA responds that collateral estoppel cannot be applied against it because the issue of whether Henry was an accommodation party was never litigated in the State litigation, and a final and binding judgment was not entered on the merits with respect to that issue.

The doctrine of collateral estoppel applies to Federal income tax cases.  See United States v. International Bldg. Co., 345 U.S. 502, 505 (1953); Commissioner v. Sunnen, 333 U.S. 591, 598 (1948).  "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent

jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979).

In cases raising an issue concerning the preclusive effect of prior State court litigation on subsequent Federal litigation, the application of preclusion doctrines such as res judicata (sometimes referred to as claim preclusion) and collateral estoppel (sometimes referred to as issue preclusion) is required by the Full Faith and Credit Act, 28 U.S.C. sec. 1738 (1994), which provides, in pertinent part, that "judicial proceedings of any court of any such State * * *.  * * * shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State".  See Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); see also Allen v. McCurry, 449 U.S. 90, 96 (1980) ("Congress has specifically required all Federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so").

In this case, the State litigation occurred in Nebraska.  We must apply Nebraska law in determining whether the State litigation must be given preclusive effect in this case.  See Migra v. Warren City School Dist. Bd. of Educ., supra at 81.

Under Nebraska law, there are four requirements for the doctrine of collateral estoppel to apply: (1) The identical issue must have been decided in a prior action, (2) a final judgment must have been rendered on the merits, (3) the party against whom the rule is applied must have been a party or in privity with a party to the prior action, and (4) there must have been an opportunity to litigate the issue fully and fairly in the prior action. See Stewart v. Hechtman, 581 N.W.2d 416, 418-419 (Neb. 1998); Cunningham v. Prime Mover, Inc., 567 N.W.2d 178, 181 (Neb. 1997).

With respect to the third requirement, there is no dispute that HJA was a party to the State litigation. See Cunningham v. Prime Mover, Inc., supra at 181 (as to status of parties, only requirement is that party against whom rule is being applied was party or in privity with party to prior action). There is considerable disagreement, however, regarding the remaining requirements.

In order for collateral estoppel to apply under Nebraska law, the identical issue must have been litigated in the prior action. An issue is considered "identical" in the absence of a significant factual change. See Stewart v. Hechtman, supra at 419. Henry's liability under the FirsTier note was not an issue in the State litigation. The only issues raised in that litigation related to the enforceability, breach, and validity of

the EOA and the covenant not to compete clause therein.  Indeed, in its modified judgment the State court did not even address whether Henry was an accommodation party as to the FirsTier note--the only reference to Henry's status as an accommodation party was in the postjudgment journal entry.  In this case, the issue we must decide is whether Henry and Esther are the primary obligors on the FirsTier note.  The issues are not identical; thus, the first requirement is not met.

The remaining two requirements for collateral estoppel to apply also are not met in this case.  In <u>United States v. International Bldg. Co.</u>, <u>supra</u> at 506, the Supreme Court held that

> A judgment entered with the consent of the parties may involve a determination of questions of fact and law by the court.  But unless a showing is made that that was the case, the judgment has no greater dignity, so far as collateral estoppel is concerned, than any judgment entered only as a compromise of the parties.

In this case, the State court did not enter a judgment regarding whether Henry and Esther were primary obligors or accommodation parties with respect to the FirsTier note.  Rather, it simply made a journal entry that referred to Henry as an "accommodating Party" in connection with a settlement of "certain conflicts which have arisen in regards to the amount payable pursuant to * * * the Modified Judgment".  Henry and Esther made no showing whatsoever as to the nature of the journal entry or that it embodied determinations of fact and law by the State court.

Moreover, on the record before us, we cannot conclude that HJA litigated or had a full and fair opportunity to litigate the issue of whether Henry and Esther were accommodation parties rather than primary obligors on the FirsTier note.

We hold that the doctrine of collateral estoppel does not preclude HJA from litigating the issue of whether Henry was an accommodation party on the FirsTier note.

C.  Accommodation Party Status Under Nebraska Law

Before 1992, Nebraska law defined "accommodation party" as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it."  Neb. Rev. Stat. U.C.C. sec. 3-415(1) (Reissue 1980).  In 1991, Neb. Rev. Stat. U.C.C. sec. 3-415 was revised and renumbered as Neb. Rev. Stat. U.C.C. sec. 3-419 (Reissue 1992).  Neb. Rev. Stat. U.C.C. sec. 3-419(a) defines instruments signed for accommodation as follows:

> If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation".  [Emphasis added.]

The term "instrument" means a "negotiable instrument."  See Neb. Rev. Stat. U.C.C. sec. 3-104(b) (Reissue 1992).

The intent of the parties determines whether a party is an accommodation party or the principal obligor of an instrument.

See Ashland State Bank v. Elkhorn Racquetball, Inc., 520 N.W.2d 189, 194 (Neb. 1994); Marvin E. Jewell & Co. v. Thomas, 434 N.W.2d 532, 534 (Neb. 1989).  A party claiming accommodation party status under Nebraska law bears the burden of proving its right to that status.  See Rule 142(a); Marvin E. Jewell & Co. v. Thomas, supra at 536.

### 1. FirsTier Note

Neb. Rev. Stat. U.C.C. section 3-419(a) and its predecessor require that both the accommodated party and the accommodation party be parties to the instrument.  We are aware of no cases that have held otherwise.

The Court of Appeals for the Eighth Circuit, to which an appeal in this case would lie, has addressed specifically the elements necessary to qualify as an accommodation party under former Neb. Rev. Stat. section 3-415(1).  See Pioneer Ins. Co. v. Gelt, 558 F.2d 1303, 1310-1311 (8th Cir. 1977).  In Pioneer Ins. Co., suit was instituted by Pioneer Insurance Co. (Pioneer) against Harry Gelt to recover on a promissory note.  At the request of a personal friend, Roger Sack, Gelt agreed to act as the ostensible buyer of an investment corporation so that Sack could avoid having to obtain the Securities and Exchange Commission's approval of the purchase.  Sack assured Gelt that Gelt would be held harmless in connection with the overall transaction and that he would not be exposed to any financial

risk. Gelt executed certain promissory notes at closing, which were renewed later. Sack was not a party to the notes. The holder of the notes subsequently sued Gelt to recover the unpaid balance. Gelt contended he was an accommodation maker of the notes and, for that reason, was not liable to Pioneer on the renewal note.

The Court of Appeals for the Eighth Circuit found that both the original note and the renewal note were executed by Gelt, as maker, and the respective payees. There were no other parties to the instruments. The court held that Gelt was not an accommodation party under Nebraska law because he "did not 'lend his name' to any other parties to the instrument". Id. at 1311. The court noted that "While there is no doubt that Gelt executed the instruments as an accommodation to Sack, that did not make him an 'accommodation party' within the meaning of [Neb. Rev. Stat. U.C.C. sec.] 3-415(1) and (5)." Id.

In this case, Henry and Esther were the only obligors under the FirsTier note and the first five extensions or modifications of that note. This fact is consistent with other evidence in the record that overwhelmingly establishes the parties intended for Henry and Esther to be the primary obligors on the FirsTier note. See Ashland State Bank v. Elkhorn Racquetball, Inc., supra at 194; Marvin E. Jewell & Co. v. Thomas, supra at 534.

Accordingly, we hold that Henry and Esther were the primary obligors on the FirsTier note and that the payments made by HJA on the FirsTier note were taxable as ordinary income to Henry and Esther in the years determined by respondent and were deductible by HJA.

### 2. Chevrolet Debt

Whether Henry was an accommodation party with respect to the Chevrolet debt depends, in the first instance, on whether the dissolution of partnership agreement qualifies as a negotiable instrument under Nebraska law. See Neb. Rev. Stat. U.C.C. sec. 3-104(b), which defines the term "instrument" used in Neb. Rev. Stat. U.C.C. sec. 3-419(a) to mean "negotiable instrument."

Neb. Rev. Stat. U.C.C. section 3-104(a) provides that an instrument is negotiable if the following requirements are met: (1) The promise or order must be unconditional; (2) the amount of money must be "a fixed amount of money, with or without interest or other charges described in the promise or order"; (3) the promise or order must be "payable to bearer or to order"; (4) the promise or order must be payable "on demand or at a definite time"; and (5) the promise or order must not state "any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money", with exceptions that do not apply in this case.

The pertinent provision of the dissolution of partnership agreement stated:

> 1.  Henry hereby agrees to take in full satisfaction of his partnership interest in Misle Brothers Partnership the assets listed under his name on Exhibit A, * * * and to assume the liabilities listed on such schedule, which total $686,467.  It is understood that the $638,186 of liability listed as inter-company loans are payable to Misle Chevrolet Company in the amount of $592,659 and to Novo Imports, Inc. in the amount of $45,527.  Henry further agrees to hold harmless Abram and Julius and to indemnify them in the event they shall ever be required to pay any of the liabilities he has agreed hereunder to assume.

This provision fails to satisfy the requirements for a negotiable instrument since it did not create a debt payable to bearer or order, and the amounts Henry assumed were not payable "on demand or at a definite time".  The dissolution of partnership agreement is exactly what it purported to be and nothing more.  It was an agreement to dissolve the Misle Brothers Partnership, wherein Henry agreed to assume outstanding intercompany liabilities.  It was not an unconditional promise or order to pay a fixed sum of money.  See Ford Motor Credit Co. v. All Ways, Inc., 546 N.W.2d 807, 810 (Neb. 1996).  Therefore, the dissolution of partnership agreement does not meet the requirements of a "negotiable instrument" under Neb. Rev. Stat. U.C.C. section 3-104.

Since the liability that Henry assumed for the Chevrolet debt did not arise from a negotiable instrument under Nebraska law, Henry was not an accommodation party with respect to the Chevrolet debt.  We hold that Henry was the primary obligor on

the Chevrolet debt and that the payments made by HJA on the Chevrolet debt were taxable as ordinary income to Henry in the years determined by respondent and were deductible by HJA.

D. Alternative Arguments

Relying upon Landreth v. Commissioner, 50 T.C. 803 (1968), Henry and Esther argue that whether a person is a primary obligor or an accommodation party depends on whether the person, because of the loan, "receives a nontaxable increase in assets" at the time of the distribution of the loan proceeds. Henry and Esther also cite Payne v. Commissioner, T.C. Memo. 1998-227, revd. on other grounds 224 F.3d 415 (5th Cir. 2000), and Whitmer v. Commissioner, T.C. Memo. 1996-83, in support of their argument that "the repayment of debt that one--as a guarantor or other contingent liability debtor--did not receive the actual benefit of is not taxable income to the non-benefitting contingent liability debtor." Henry and Esther's argument based on these cases is misplaced.

Our decisions in Landreth v. Commissioner, supra, Payne v. Commissioner, supra, and Whitmer v. Commissioner, supra, are distinguishable. In Landreth, Payne, and Whitmer, the taxpayers were guarantors, not primary obligors. Because the taxpayer in each case was a guarantor, we held that the taxpayer did not receive discharge of indebtedness income when the liabilities he had guaranteed were discharged.

Since Henry and Esther were not guarantors of the loans at issue in this case, their reliance on <u>Landreth</u>, <u>Payne</u>, and <u>Whitmer</u> does not help them.

II. <u>Whether Henry May Reduce the Gross Amount of the Option Price Paid to Him or for His Benefit Pursuant to the Option and Stock Purchase Agreement by $150,000, the Amount Allegedly Owed and Paid to Bryan</u>

The clear language of the EOA indicates that "In consideration of the grant of the Option by HM to HJA, HJA shall pay to HM the sum of * * * ($300,000.00)".  Indeed, there is no dispute that Henry received $286,411 in 1990 for the option.  The only dispute is whether Henry may exclude from his 1990 taxable income $150,000 of the $286,411 option payment.

Henry and Esther claim in this case that the remaining $150,000 of the option payment was owed to Bryan for HJA stock that Bryan acquired in 1990 from Henry.  Respondent disagrees, claiming that the full amount of the option price must be reported by Henry as investment income on his 1990 Federal income tax return.  We agree with respondent.

The record overwhelmingly supports respondent's position that Henry received the $150,000 as part of the consideration paid by HJA for the option to purchase Henry's stock under the EOA and that the subsequent payment by Henry to Bryan of a portion of that consideration was a loan repayment to Bryan.  When the EOA giving HJA an exclusive option to purchase all of Henry's 10,000 shares of HJA's stock was executed, Bryan, a party

to the EOA, did not assert any ownership interest in HJA. Bryan testified that at the time the EOA was executed, both he and Henry took the position that Bryan did not own any HJA stock. By their signatures on the EOA, Henry and Bryan specifically warranted that Henry was the sole owner of 10,000 shares of HJA stock. There was no statement anywhere in the EOA that Bryan owned any interest in HJA or that Bryan was entitled to receive any part of the option payment. To the extent that Bryan had any interest in the Misle group, those interests were addressed specifically in the EOA. For example, the EOA contained provisions with respect to Bryan's ownership interest in BHM, the allocation of fringe benefits to Bryan in consideration for his compliance with the terms of the EOA, and the return of funds in a company bank account belonging to Bryan. Lastly, Sheryl Matthes, the controller of HJA since 1990, testified there were no entries in HJA's books indicating Bryan ever owned stock in HJA; the only entries relative to HJA's stock ownership were the three original entries indicating that Henry, Abram, and Julius owned 10,000 shares of HJA stock each. Accordingly, we sustain respondent's determination.

III. Whether Henry and Esther are Liable for Accuracy-Related Penalties for Tax Years 1989 Through 1994 and 1996 Under Section 6662(a)

Respondent determined that Henry and Esther are liable for accuracy-related penalties under section 6662(a) and (b)(2) (for

substantial understatement) for each of the years 1989 through 1994 and 1996.  Alternatively, with respect to the years 1989 through 1994, respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(1) (for negligence).

Section 6662(a) and (b)(2) imposes a penalty equal to 20 percent of the portion of an underpayment of income tax attributable to any substantial understatement of tax.  A substantial understatement occurs when the amount of the understatement exceeds the greater of 10 percent of the amount of tax required to be shown on the return or $5,000 ($10,000 for corporations).  See sec. 6662(d)(1).  The amount of an understatement on which the penalty is imposed will be reduced by the portion of the understatement that is attributable to the tax treatment of an item (1) that was supported by "substantial authority" or (2) for which the relevant facts were "adequately disclosed in the return or in a statement attached to the return".  See sec. 6662(d)(2)(B).[21]  Additionally, no penalty will be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and the taxpayer acted in good faith with respect to such portion. See sec. 6664(c)(1).

---

[21]For 1993 and later years, adequate disclosure must be coupled with "a reasonable basis for the tax treatment".  See sec. 6662(d)(2)(B)(ii).

Substantial authority exists when the weight of authority supporting the treatment of an item is substantial as compared to the weight of authority for the contrary treatment.  See sec. 1.6662-4(d)(3)(i), Income Tax Regs.  In determining whether there is substantial authority, all authorities relevant to the tax treatment of an item, including those authorities pointing to a contrary result, are taken into account.  See id.  For this purpose, authorities include statutory and regulatory provisions, legislative history, administrative interpretations by the Commissioner, and court decisions, but not conclusions reached in treatises or legal periodicals.  See Booth v. Commissioner, 108 T.C. 524, 578 (1997); sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

Adequate disclosure for purposes of section 6662 is made in one of two ways.  A disclosure is adequate either if the disclosure is made on a properly completed form attached to the taxpayer's return, see sec. 1.6662-4(f)(1), Income Tax Regs., or if the disclosure is permitted by annual revenue procedure to be made on the tax return itself and is made in accordance with the applicable forms and instructions, see sec. 1.6662-4(f)(2), Income Tax Regs.  If the annual revenue procedure does not permit the disclosure of an item on the face of the return, disclosure is adequate only if the disclosure is made on a properly completed Form 8275, Disclosure Statement, or Form 8275-R, Regulation Disclosure Statement, attached to the taxpayer's

return for the year the disclosure applies.  See id.  Disclosure of a recurring item must be made for each year in which the item is taken into account.  See id.

In the notices of deficiency for 1989 through 1994 and 1996, respondent proposed several adjustments with respect to Henry and Esther's tax returns.  Most of those adjustments were settled before trial or are computational.  As to those items settled in favor of respondent, Henry and Esther made no showing at trial, and did not argue on brief, that their tax treatment of those items was supported by substantial authority or by adequate disclosure as defined by section 1.6662-4(f)(1) and (2), Income Tax Regs.  Henry and Esther's only argument in support of their position that they should not be liable for the penalties was contained in their reply brief and was limited to the covenant not to compete payments that were applied to the FirsTier note and the Chevrolet debt.  Consequently, we hold that Henry and Esther have failed to prove that the section 6662 penalty should not apply with respect to the settled and computational issues. See Rule 149(b).

With respect to the covenant not to compete payments, although Henry and Esther failed to address the section 6662 penalties in their opening brief, they did argue in their reply brief that the accuracy-related penalty should not be imposed with respect to the HJA payments applied to the FirsTier note and

the Chevrolet debt because they had substantial authority for their position and that they were entitled to relief under section 6664. Respondent anticipated these arguments in his opening and reply briefs. Although we could treat Henry and Esther's failure to address the accuracy-related penalties in their opening brief as a concession or abandonment of the issue, we decline to do so under these circumstances. See Rule 151(e)(5); Lencke v. Commissioner, T.C. Memo. 1997-284. Instead, we shall consider the arguments made by Henry and Esther with respect to the disputed payments.

Henry and Esther argue that their reporting position regarding the FirsTier and Chevrolet payments was made on a bona fide factual belief that they were not the primary obligors of the FirsTier note or the Chevrolet debt and, therefore, were not obligated to report as their income the payments made by HJA on the two liabilities. Henry and Esther also argue that respondent has not directed the Court's attention to any rule, regulation, or case law that required Henry and Esther to declare the payments as income. They assert that there is significant case law in support of their reporting position; therefore, they had a reasonable basis for their view, and they should not be liable for the accuracy-related penalties.

Henry and Esther did not have substantial authority for their positions. See sec. 6662(d)(2)(B)(ii). Although they rely

on <u>Landreth v. Commissioner</u>, 50 T.C. 803 (1968), <u>Payne v. Commissioner</u>, T.C. Memo. 1998-227, and <u>Whitmer v. Commissioner</u>, T.C. Memo. 1996-83, as substantial authority for their reporting position, their position is not supported by any well-reasoned construction of the relevant authorities.  The cases cited on brief are readily distinguishable and, to the extent they are pertinent, actually undermine Henry and Esther's argument.  See <u>Estate of Reinke v. Commissioner</u>, 46 F.3d 760, 765 (8th Cir. 1995), affg. T.C. Memo. 1993-197; <u>Antonides v. Commissioner</u>, 91 T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990).  We have rejected the factual basis of Henry and Esther's claim that they were accommodation parties, and, thus, the authority they cite holding that a guarantor does not realize income when the underlying debt is paid is not substantial authority for purposes of section 6662.

The only other argument made by Henry and Esther in support of their position that they should be relieved of any penalty under section 6662 is that they had reasonable cause for their reporting position and that they acted in good faith.  See sec. 6664(c).[22]  The determination of whether a taxpayer acted with

---

[22]Although Henry and Esther made disclosures that they had omitted the payments from their 1992 and 1996 returns, they have not asserted or argued that the disclosures were adequate disclosures.  See <u>Cramer v. Commissioner</u>, 101 T.C. 225, 255 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); sec. 1.6661-4(b)(3), Income Tax Regs.  Even after respondent, anticipating an adequate
(continued...)

reasonable cause and in good faith is made case by case, taking into account all pertinent facts and circumstances. See Compaq Computer Corp. & Subs. v. Commissioner, 113 T.C. 214, 226 (1999); sec. 1.6664-4(b)(1), Income Tax Regs. In this case, there is ample evidence that Henry and Esther knew or had reason to know that the payments made by HJA on the FirsTier note and the Chevrolet debt generated taxable income to them as determined in this opinion, including (1) the Baird, Kurtz letter explaining the consequences of the EOA, (2) Forms 1099 and letters of explanation issued by HJA showing the amount of covenant not to compete payments made to Henry each year, (3) the fact that Henry and Esther reported as income some of the covenant not to compete payments made in 1990, (4) the establishment and operation of the sweep account, which coordinated the covenant payments with payments on the FirsTier note and the Chevrolet debt, and (5) Henry's conflicting positions with regard to his liability for the FirsTier note and the Chevrolet debt taken in the State

---

[22](...continued)
disclosure claim, argued in his opening brief that Henry and Esther's disclosures on their 1992 and 1996 returns were not adequate, Henry and Esther still did not argue that they made an adequate disclosure for those years. Since Henry and Esther did not raise adequate disclosure as a defense to the substantial understatement prong of the accuracy-related penalty at any point during the trial or briefing of this case, the issue of whether the 1992 and 1996 disclosures were adequate is not before us.

litigation and in this case.[23]  This evidence supports a conclusion that Henry and Esther's position regarding the disputed payments was not asserted in good faith, as required by section 6664(c).

We hold that Henry and Esther are liable for the accuracy-related penalty in each of the years 1989 through 1994 and 1996. In light of our holding, we do not address respondent's alternative position regarding section 6662.

IV.  <u>Whether Henry Is Liable for an Addition to Tax Under Section 6651(a) for Failure To File a Return for Tax Year 1995</u>

Section 6651(a) imposes an addition to tax for failure to file a return, unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  See sec. 6651(a)(1); <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985); <u>United States v. Nordbrock</u>, 38 F.3d 440, 444 (9th Cir. 1994); <u>Harris v. Commissioner</u>, T.C. Memo. 1998-332.  A failure to file a timely Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and, nevertheless, was unable to file the return within the prescribed time.  See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect means a conscious, intentional failure to file or reckless indifference.  See <u>United States v. Boyle</u>, <u>supra</u> at 245.

---

[23]In the State trial, Henry admitted that he had a personal debt to both FirsTier and Chevrolet and that part of the covenant not to compete payments deposited into the sweep account was going to FirsTier and Chevrolet to pay his personal debts.

Henry bears the burden of proving that respondent erred in determining the addition to tax applies.  See Rule 142(a).

Henry concedes that, to date, he has failed to file any 1995 individual income tax return.  Henry argues, however, that during 1995 Henry and Esther sold a significant number of shares in various companies that had been purchased between 1986 and 1995. At the time of the sale, Henry and Esther did not know their original basis in the stock and, therefore, did not have necessary information upon which to file an accurate return to reflect their capital gains tax liability.  Henry contends that, with the help of their tax preparer, Mr. Goeglein, he made a diligent attempt to locate the additional necessary information by contacting various financial institutions and research firms, but the information regarding the stock was difficult to obtain. According to Henry, Mr. Goeglein "had ongoing dialogue with Commissioner's Revenue Agent Glenn Hofer", who "insisted that Henry Misle and Mr. Goeglein obtain an accurate basis for the stock when filing their return."  Henry essentially contends that the section 6651(a) addition to tax should not be assessed because he was acting in good faith to comply with the request of respondent's agent and because finding accurate information necessary to complete a timely return was too difficult.

As a general matter, the unavailability of information is not reasonable cause for failing to file a timely return.  See

Crocker v. Commissioner, 92 T.C. 899, 913 (1989); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1342-1344 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Cook v. Commissioner, T.C. Memo. 1999-50; Barber v. Commissioner, T.C. Memo. 1997-206. Unless a taxpayer applies for and obtains a timely extension of time to file, a taxpayer is expected to file a timely return based on the best information available and then file an amended return if necessary. See Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982); Cook v. Commissioner, supra; Barber v. Commissioner, supra. Henry has not proved that his failure to file a 1995 Federal income tax return was due to reasonable cause and not to willful neglect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We hold that Henry is liable for the addition to tax under section 6651(a)(1) for 1995.

V. Whether Henry Is Liable for an Addition to Tax Under Section 6654 for Failure To Make Estimated Tax Payments for Tax Year 1995

Section 6654(a) provides for an addition to tax in the case of any underpayment of estimated tax by an individual. The addition to tax under section 6654(a) is mandatory in the absence of statutory exceptions. See sec. 6654(a), (e); Recklitis v. Commissioner, 91 T.C. 874, 913 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980).

Respondent determined that Henry is liable for the addition to tax under section 6654 for 1995. Henry and Esther's only

argument for relief from liability under section 6654 is that they had reasonable cause for their failure to make estimated tax payments under section 6654(a). With limited exceptions,[24] "This section has no provision relating to reasonable cause and lack of willful neglect. It is mandatory and extenuating circumstances are irrelevant." <u>Estate of Ruben v. Commissioner</u>, 33 T.C. 1071, 1072 (1960); see also <u>Grosshandler v. Commissioner</u>, <u>supra</u> at 21. In addition, Henry has offered no evidence that any of the statutory exceptions under section 6654(e) apply. Accordingly, respondent's determination is sustained.

## VI. <u>Conclusion</u>

We have carefully considered the remaining arguments of petitioners for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing and concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[24]Sec. 6654(e)(3)(B) provides for an exception for newly retired or disabled individuals where the taxpayer (1) either is retired after having attained the age of 62 or became disabled in the taxable year or the preceding taxable year in which the estimated payments were required to be made, and (2) can demonstrate that any underpayment was due to reasonable cause and not to willful neglect. Sec. 6654(e)(3)(B) does not apply in this case.